FILED
2013 Oct-04  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLETTE SWANN JACKSON, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 12-CV-01753-WMA |
| | } | |
| UNITED PARCEL SERVICE, INC., | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Charlette Swann Jackson ("Jackson" or "plaintiff") brings this action against United Parcel Service, Inc. ("UPS" or "defendant") alleging race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981. Defendant now moves for summary judgment. The court concludes for the following reasons that the motion must be granted.

## BACKGROUND

This is not a case about overt discrimination. There is no allegation of any racial slur, sexual advance, or exclusive policy. Nevertheless, it seems to plaintiff from the full context of the case that something is rotten in the state of UPS, and it is this circumstantial conclusion that the court must consider here.

1

**An Idea Is Born: Plaintiff Seeks a Promotion**

The story begins in 2005.  Plaintiff was then a 13 year veteran of UPS, and had achieved the rank of "full-time package car driver" in UPS's Birmingham, Alabama location.[1]  Jackson Dep., Def.'s Ex. 1, at 55.  She was also a "bargaining unit representative for the safety committee."  Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 3.  One morning, after plaintiff spoke about safety at a "PCM" (a "pre-work communication meeting," in the UPS lingo), she was approached by Charlene Thomas, an "operations manager," about management positions at UPS.  Jackson Dep. at 168.  Thomas, like plaintiff, is a black woman, *id.* at 170, and expressed to plaintiff her opinion that there were not enough black women in management at UPS, *id.* at 169-70.  Perhaps Thomas felt that plaintiff was a good candidate to help correct this imbalance-- plaintiff was the daughter of a package store owner, *id.* at 57, had worked in her father's store as a teenager, *id.* at 57-58, and had accumulated 13 years of mostly positive experience at UPS.  Whatever the reason, Thomas asked whether plaintiff was interested in going into management, and plaintiff said "yes."  *Id.* at 168.  Thomas encouraged plaintiff, but told her that she

---

[1] "Package car driver" was plaintiff's fifth position with UPS.  Jackson Dep., Def.'s Ex. 1, at 51-55.  While the exact UPS hierarchy is unclear from the record, the five positions look like a normal line of promotion.

likely needed a college degree before she could be promoted.  *Id.*
at 169.[2]

 Plaintiff took this conversation to heart.  She enrolled at
Faulkner University and began taking courses in the evenings,
while continuing to work as a full time package driver at UPS
during the day.  *Id.* at 50.  In 2008, she completed a degree in
business administration.  *Id.*  She also continued to serve on the
UPS safety committee.  *Id.* at 38.  Armed with these new
qualifications, she wrote a letter to UPS's Human Resources
Department expressing her interest in a management position and
requesting a personal interview.  Letter from Jackson to UPS
(Feb. 11, 2008), Pl.'s Ex. 4.

**UPS Management Hiring Procedures**

 Whether UPS ever responded specifically to plaintiff's
letter is not clear.  In any case, plaintiff would never have
been hired on the basis of her letter alone, inasmuch as UPS has
a mechanical process that any management candidate must go
through before being hired.  This process has five components.

---

 [2]Thomas' recollection of the conversation is slightly
different.  She testified that plaintiff approached her about a
possible promotion, not the other way around, and does not recall
making any comments regarding race or gender disparity in UPS
management.  *See* Thomas Dep., Pl.'s Ex. 72, at 23-28.
Regardless, for purposes of this summary judgment motion, all
facts are considered in the light most favorable to plaintiff.
*See  Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)
("The evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his favor.") (citation
omitted).

First, the candidate must submit a letter expressing interest in the management position.  Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 14.  A new letter must be submitted for each calendar year in which a candidate wishes to be considered.  The letter must be supported with four performance markers: (1) an "Initial Assessment" completed by the candidate's current supervisor; (2) a multiple choice test known as the "Applicant Profile"; (3) a written decision-making test known as the "In Box Test"; and (4) a "Panel Interview" in which the candidate is asked how he or she would handle scenarios as a UPS manager.  *Id.*  Once these five requirements are completed, the candidate is placed in the "promotion pool."  *Id.* at 15.  When management positions become available, UPS chooses candidates from this pool for personal interviews and, finally, hiring.  *Id.*

After submitting her letter to UPS in 2008, plaintiff completed each of the four required tests, and readied herself for the next available promotion.

**The 2009 Position**

The first position to become available after plaintiff entered the promotion pool was an "on-road supervisor" position in the Birmingham location.  Mowery Dep., Def.'s Ex. 4, at 40. The hiring decision was taken on by the aforementioned Charlene Thomas, an "Operations Manager"; Dale Mowery, a "District

4

Manager"; and Jeff Poulter, a "Human Resources Manager."  Pl.'s
Opp'n at 6.  Thomas is a black woman; Mowery and Poulter are
white men.  These managers considered plaintiff qualified for the
position, Mowery Dep. at 40, and Mowery interviewed plaintiff as
a finalist for the position, Jackson Dep. at 314.  Ultimately,
however, Wendy Whitlow, who is white, was chosen for the
position.  Mowery suggested to plaintiff at the time, Jackson
Dep. at 315, and reiterates now, Mowery Dep. at 45-46, that the
primary reason for the hiring decision was the upheaval within
the company at that time.  UPS was downsizing, and Whitlow's
management position at another location had been eliminated.  *See
id.*  Mowery and the other managers decided to move Whitlow
horizontally into the new position at UPS's Birmingham location
rather than promote a new manager with an increase in pay.  *See
id.*

**2009-2010: Tension Builds**

For the next two years, no new management positions became
available.  Plaintiff was now supervised by Whitlow, but the fact
that they had been competitors for Whitlow's position does not
appear to have created any bad blood between them.  Whitlow
testified that plaintiff was a model employee, Whitlow Dep.,
Pl.'s Ex. 72, at 13-16, and indeed, since Whitlow's previous
positions with UPS had involved safety and marketing, but never
driving, plaintiff "was friendly and helpful and helped [Whitlow]

ease into [her] role," *id.* at 16.

Elsewhere, things at UPS were decidedly less harmonious. Mowery, the manager primarily responsible for the 2009 hiring decision, was "demoted and[] reassigned out of the Alabama district." First Poulter Dep., April 19, 2013 ("Poulter Dep. I"), Def.'s Ex. 5, at 78. Poulter demurred as to the exact reason for the demotion, but he admitted that Mowery's management style was "inappropriate," *id.* at 78, and one possible inference to draw from the testimony is that the demotion was related to complaints of discrimination, *see id.* at 76-82.

If UPS was concerned about the perception that Mowery was a discriminatory manager, it chose a peculiar remedy. Mowery's replacement was Jaime Diaz, who was transferred from UPS's Kansas location after at least three complaints of discrimination were filed against him with the Equal Employment Opportunity Commission ("EEOC"), two of which proceeded to litigation in federal court. *See* Pl.'s Opp'n at 8-9. In Diaz's first three months in Birmingham, he managed to drum up an astounding nine additional complaints against him. *See* Poulter Memorandum of March 3, 2010 ("Poulter Mem."), Pl.'s Ex. 72. The complaints included allegations of race- and gender-neutral harassment, but at least seven of the nine complainants were black (Diaz is Hispanic, Diaz Decl., Def.'s Ex. 8, at ¶ 3), and four of the complaints alleged direct racism, including use of "derogatory

6

vocabulary."  Poulter Mem.

Among the complaints against Diaz was one made by plaintiff. In November, 2009, Diaz and plaintiff had a minor disagreement over whether plaintiff had been underpaid by one hour.  Def.'s Mot. at 5.  Plaintiff filed a grievance, which was quickly resolved in her favor.  *Id.* at 5-6.  A few weeks later, in December, 2009, plaintiff approached Diaz about an unrelated matter.  *Id.* at 6.  The exact nature of their interaction is unclear, but Diaz mentioned the previous grievance, and the two exchanged something at the intersection of a handshake, a hug, a push, and a hit.  *Id.* at 7.  The court's best guess from the evidence, taking into account the summary judgment standard, is that Diaz forcefully swatted plaintiff's arm away from him, causing discomfort but leaving no injury or mark.

Plaintiff had initially planned to let the incident go, but when, two months later, in February, 2010, she witnessed Diaz shove another employee, she resolved to take action.  Pl.'s Opp'n at 13.  She first submitted a written complaint about the incident to Poulter.  *Id.*  Poulter, along with Thomas, promptly met with plaintiff to discuss the incident and assured her that they would thoroughly investigate.  Apparently unsatisfied with this assurance, plaintiff, unbeknownst to all, filed a police report against Diaz the next day.  Diaz was arrested for assault shortly thereafter at a UPS facility, though the charges were

later dismissed.  When the dust settled, Poulter concluded that the evidence of the handshake-hug-shove-hit was too confused to assign fault to either party, but he instructed Diaz not to come to the Birmingham facility anymore. *See id.* at 7-12.  Indeed, Diaz was transferred to a new location soon afterward,[3] and plaintiff has not seen him since the February incident.  Jackson Dep. at 142.

Nevertheless, two months later, on April 15, 2010, plaintiff filed a complaint based on the incident with the Equal Employment Opportunity Commission ("EEOC").  The EEOC found no reasonable cause to believe discrimination occurred, and issued a Dismissal and Notice of Suit Rights on August 27, 2010.

**The January 2011 Position**

In January, 2011, a "full-time supervisor" position became available in UPS's Birmingham location.  With Mowery and Diaz gone, the new Division Manager in charge of the hiring decision was Stan Garrett.  Garrett, like plaintiff, is black, and unlike his predecessors has no history of discrimination complaints against him.  Nevertheless, plaintiff fared more poorly here than for any other position--she was not considered for the position at all because UPS did not receive the required "letter of interest" from her.  Def.'s Mot. at 16-17.

---

[3]Diaz's propensity for acquiring discrimination complaints against him has continued at his new location. *See* Pl.'s Exs. 54-57.

8

There is some dispute as to the circumstances of the un-received letter.  Defendant contends that the letter was simply not sent in time.  UPS requires a new letter of interest to be filed for each new calendar year, such that any 2010 letter of interest "expired as of December 31, 2010."  Def.'s Reply at 7. Since candidates for the 2011 position were collected "during the second week of January," the window to submit a new letter of interest for it was very small indeed.  Def.'s Mot. at 17.  By January 17, when plaintiff submitted her letter, Pl.'s Ex. 20, the hiring process had run its course, and a new supervisor was already selected, Def.'s Reply at 4-5.  Thus, according to defendant, while the policy may have worked an unfortunate result, it did so only so in an equal opportunity, or equal lack of opportunity, way.

Plaintiff takes a more cynical view of the situation.  She claims that she attempted repeatedly to submit her letter before January 17, but that defendant mishandled or intentionally denied receiving it.  Pl.'s Opp'n at 15-16.  Furthermore, she claims that defendant fabricated a "Candidate Interview Log" that showed an interview of the eventual promotion choice, Brian Tillman, when in fact Tillman was never interviewed.  *Id.* at 17.  In short, she implies that the position was given to Tillman under some kind of insider arrangement, such that she could never have been hired no matter how many hoops she jumped through, and that

the "facts" now before the court are an elaborate UPS cover-up. *See id.* at 15-18.

Plaintiff promptly filed an EEOC complaint based on the Tillman promotion on February 7, 2011.

**The July, 2011 Position**

In July of the same year, another full-time supervisor position became available, this time in UPS's Roebuck package center.[4]  Def.'s Mot. at 18.  Kim Campbell, a white female, was the Division Manager responsible for that location, and was responsible for the hiring decision.  She selected four finalists from the promotion pool, including two who had already interviewed for but not obtained previous positions: plaintiff, who had been considered for the 2009 position, and Doug Hutcheson, a white male, who had been considered for the January, 2011 position.  *Id.* at 19.  Hutcheson, like plaintiff, was a driver seeking to enter management for the first time.  Campbell eventually selected Hutcheson, citing his greater efficiency as a driver and superior safety record.  *Id.* at 19-21.  Plaintiff vigorously protests Campbell's conclusions, particularly her conclusion about Hutcheson's safety record, Pl.'s Opp'n at 19, and also points out that Hutcheson had no college degree and less

---

[4]The position was originally anticipated in February, 2011, but due to unforseen delays, the position did not materialize until July, 2011.  Regardless, plaintiff and Hutcheson, the driver ultimately selected for promotion, were both considered for the position from the outset.

seniority than plaintiff.

Plaintiff also alleges that, as with the January, 2011 position, there is more here than meets the eye.  Campbell has been the subject of allegations outside this case that she promotes only white employees, and even that she has sought to remove black supervisors and replace them with white employees. *See* EEOC Complaint of Anton Brandy, December 21, 2011, Pl.'s Ex. 19.  Moreover, in the instant case, plaintiff has presented evidence that Campbell did not acquire Hutcheson's safety and performance records until after she had made her hiring decision. *See* Pl.'s Opp'n at 19.  Thus, plaintiff suspects, these records were not the real reasons for Campbell's hiring decision, but only *post hoc* justifications invented to protect UPS in the event of litigation.

**The August 2011 Position**

In August, 2011, a final full-time supervisor position became available, this time again in the Birmingham facility and under the direction of Stan Garrett.  Plaintiff was once again selected as one of three finalists for the position.[5]  Garrett

---

[5]Defendant has claimed and provided documentary evidence that, before both the July and August 2011 hiring decisions were made, plaintiff was interviewed for the positions.  *See* Def.'s Mot. at 21 n.6, 22 n.7.  While plaintiff claimed in both her deposition, *see* Jackson Dep. at 73, 83, and her second EEOC complaint, Pl.'s Ex. 9, that she was never interviewed for the positions, she appears to concede in her opposition memorandum that she was interviewed, *see* Pl.'s Opp'n at 18, 20.

eventually chose Walter Graham, a white man, for the position. He explained that Graham was well qualified, and that, all else being equal, he prefers to promote from outside the Birmingham facility. Def.'s Mot. at 22. Promotions within the same facility, he thinks, can cause problems with "morale and the ease of exercise of authority." *Id.* Plaintiff, as mentioned above, had long worked in the Birmingham facility, while Graham was an employee at the Huntsville facility.

Plaintiff points out that Garrett's stated preference for hiring outside the Birmingham facility is undermined by internal promotions he has made in the past. Pl.'s Opp'n at 21. Leaving that dubious preference aside, she says, casts great doubt over the validity of Garrett's hiring decision: plaintiff believes that her credentials were markedly superior to Graham's, *id.* at 20-21, and that Garrett's testimony betrays an improper preference for male supervisors, *id.* at 21.

**On to Court**

On September 22, 2011, the EEOC responded to plaintiff's February 2011 complaint regarding the January 2011 hiring decision. Pl.'s Ex. 64 at 1-3. It "found reasonable cause to believe that [plaintiff] was retaliated against and her letter of interest and promotion packet were not submitted to the proper office, along with the other candidates, because she filed a previous charge of Discrimination, in violation of Title VII."

12

*Id.* at 2.  The EEOC referred the case for mediation, and when
that failed, it issued plaintiff a Notice of Right to Sue.  *Id.*
at 3.

On May 2, 2012, plaintiff filed suit in this court, alleging
that UPS improperly denied promotions to her because of her
gender, Compl. ¶¶ 20-26, her race, Compl. ¶¶ 31-38, and her
choice to engage in the protected activity of filing complaints
about past discrimination, Compl. ¶¶ 27-30, all in violation of
Title VII and 42 U.S.C. § 1981.  After lengthy discovery,
defendant filed the present motion, seeking summary judgment on
all claims and dismissal of plaintiff's suit on the merits.

## DISCUSSION

The parties' briefs raise three issues that the court must
resolve: (1) whether plaintiff's claims are barred from
consideration by procedural defects; (2) whether plaintiff has
presented sufficient evidence to proceed to trial on her
discrimination claims; and (3) whether plaintiff has presented
sufficient evidence to proceed to trial on her retaliation claim.

## A.  Procedural Defects

To bring a Title VII action, a plaintiff must jump several
procedural hurdles.  First, the statute requires a plaintiff to
exhaust her administrative remedies by filing a complaint with
the EEOC before she is permitted to file suit in federal court.
*See* 42 U.S.C. § 2000e-5(e); *Stuart v. Jefferson Cnty. Dep't of*

13

*Human Res.*, 152 F. App'x 798, 800 (11th Cir. 2005) ("As a prerequisite to filing suit under Title VII, a plaintiff must file a timely charge of discrimination with the EEOC.") (citation omitted).  This requirement implicates two statutes of limitations.  The complaint with the EEOC must be filed within 180 days of the discriminatory act, *see* § 2000e-5(e); *Tipp v. AmSouth Bank*, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998) *aff'd sub nom.* 229 F.3d 1166 (11th Cir. 2000), and the complaint in the federal court must be filed within 90 days of the conclusion of the EEOC proceeding, *see* § 2000e-5(f)(1); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1160 (11th Cir. 1993).

Plaintiff alleges five incidents of possible discrimination and retaliation to which these procedural steps apply.  First is defendant's failure to promote plaintiff when it instead hired Wendy Whitlow for the 2009 supervisor position.  Because plaintiff never filed an EEOC complaint regarding this hiring decision and the deadline to do so has long since passed, the said decision is not actionable in this litigation.

Second is the December 10, 2009 altercation with Diaz.  Plaintiff filed an EEOC complaint in relation to the altercation on April 15, 2010.  The EEOC found no reasonable cause to believe discrimination occurred, and issued a Dismissal and Notice of Suit Rights on August 27, 2010.  Thus, while the EEOC complaint was filed well within the 180 day limitations period, the 90 day

14

limitations period for filing suit in this court expired nearly three years ago, in November, 2010.  Therefore, the altercation with Diaz is also barred from consideration in this litigation.

Plaintiff appears to concede that neither of these first two incidents is actionable.  *See* Pl.'s Opp'n at 5 n.2; Pl.'s Sur-reply at 2-3.  The two incidents may still be relevant, of course, as evidence of animus in actionable claims.

The third incident is the January, 2011 hiring of Brian Tillman.  On February 7, 2011, only weeks into the 180 day limitations period, plaintiff filed an EEOC complaint related to this hiring decision.  On September 22, 2011, the EEOC issued a finding of reasonable cause to believe that retaliation had occurred, and on February 2, 2012, after conciliation discussions failed, the EEOC issued a Notice of Right to Sue.  Plaintiff brought this action on May 2, 2012, thus (by the skin of her teeth) meeting the 90 day deadline.  Her claims relating to the January, 2011 hiring are therefore actionable.

The fourth and fifth employment actions complained of are the July and August 2011 hiring decisions.  Because plaintiff filed no complaints with the EEOC after February, 2011, and because the 180 periods to do so for the July and August, 2011 promotions expired in January and February, 2012, respectively, plaintiffs claims related to those hiring decisions should also be time barred.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 114 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'  [Plaintiff] can only file a charge to cover discrete acts that 'occurred' within the appropriate time period [the 180 days directly preceding the filing of the EEOC charge].").  However, the exhaustion requirement of Title VII is not jurisdictional, and thus the court need not enforce it *sua sponte*.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").  Here, defendant has declined to file a motion to dismiss, and its summary judgment motion challenges the timeliness of only the pre-2011 incidents.

Nevertheless, the court finds that the July and August 2011 hiring decisions are not properly before it for a different reason.  Though plaintiff provides arguments regarding these hiring decisions in her brief, *see* Pl.'s Opp'n at 26-27, the complaint mentions only the January 2011 promotion, *see* Compl. ¶¶ 10-38.  A summary judgment opposition brief is an inappropriate venue for raising new grounds for relief.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004).  "At the summary judgment stage, the proper procedure for plaintiffs to

assert a new claim is to amend the complaint in accordance with
Fed. R. Civ. P. 15(a)." *Id.* at 1315.  Enforcement of this rule
is especially important when, as here, an amendment to the
complaint would almost certainly fail, as it could be opposed on
timeliness grounds.  *Zipes*'s doctrines of "waiver, estoppel, and
equitable tolling," 455 U.S. at 393, prevent a defendant from
lulling a plaintiff into believing that filing a complaint with
the EEOC is unnecessary, then later winning dismissal based on
the plaintiff's failure to do so.  Here, the opposite is
happening: plaintiff has lulled defendant into believing that a
motion to dismiss on exhaustion grounds was unnecessary, and now
seeks to win on claims that would have been dismissed had the
defendant so moved.[6]

Plaintiff also invokes 42 U.S.C. § 1981 in her complaint.
Section 1981, in short, employs identical analysis to Title VII
and provides identical relief, *see Bryant v. Jones*, 575 F.3d
1281, 1296 n.20 (11th Cir. 2009) ("[D]iscrimination claims . . .
brought under the Equal Protection Clause, 42 U.S.C. § 1981, or

---

[6]Just as a claim for relief based on the July and August
2011 hiring decisions is absent from the complaint, so too is any
reference to the facts of those hiring decisions.  *See* Compl. ¶¶
10-19.  But the latter absence does not raise the same problems
as does the former.  Federal Rule of Civil Procedure 56(c)(1)(A)
allows parties at summary judgment to rely on discovery documents
in support of their factual positions, and the evidence
surrounding the July and August 2011 promotions appears *ad
nauseum* in the parties' voluminous evidentiary attachments to
their briefs.

Title VII are subject to the same standards of proof and employ the same analytical framework.") (citations omitted), but has no exhaustion requirement and a longer statute of limitations, *see Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460-66 (1975). However, because the court bases its conclusion regarding the July and August hiring decisions on plaintiff's failure to present them in her complaint, rather than on her failure to file a timely EEOC charge about them, § 1981 cannot save the said claims.  Moreover, plaintiff has not mentioned § 1981 since the complaint was filed, and cites only Title VII cases in her brief, and so the § 1981 claims have been abandoned.  *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

**B.  DISCRIMINATION**

With the procedural issues squared away, the court turns to the merits of plaintiff's remaining claims.  First is the allegation that, in hiring Brian Tillman instead of plaintiff for the January 2011 supervisor position, defendant discriminated against plaintiff in violation of Title VII.  The complaint alleges discrimination based on both race and sex, but both parties treat the two motivations together in their briefs.  The court cannot ascertain from the record whether plaintiff does not

know which of the proscribed motivations caused her to be denied promotion or whether she is charging an intersectional motivation of discrimination against a class of black females.  The EEOC found no cause to believe discrimination occurred in this hiring decision, but the court reviews plaintiff's allegations *de novo*. *Young v. FedEx Exp.*, 432 F. App'x 915, 917 (11th Cir. 2011) ("The district court is not required to defer or make reference to the EEOC determination, as it has to conduct a *de novo* review of the claims.").

The three part, burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), has become a Vedic chant for Title VII cases: first, the complainant "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination"; second, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection"; and finally, the complainant must show that the employer's "stated reason for respondent's rejection was in fact pretext."  But the first two burdens in this framework are easily met and, once they "fulfill [their] role of forcing the defendant to come forward with some response, [they] simply drop[] out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).  Thus, when a defendant employer offers a non-

discriminatory reason for its hiring decision in a summary judgment motion, courts often move directly to what is inevitably the crucial question under the statute: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Indeed, other circuits have even concluded that in these cases "the district court need not-**and should not**-decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Id.* (emphasis in original); *see also Bailey-Potts v. Ala. Dep't of Pub. Safety*, 3:11CV495-MHT, 2012 WL 566820, at *4 (M.D. Ala. Feb. 21, 2012) ("In most cases, the real question lies in whether the employer's legitimate non-discriminatory reason is pretextual."); *Shuford v. Ala. State Bd. of Educ.*, 978 F. Supp. 1008, 1017 (M.D. Ala. 1997) *aff'd sub nom.* 152 F.3d 935 (11th Cir. 1998) ("However, where, as in this case, the court has sufficient evidence to determine whether an employee has been a victim of discrimination, the court need not go through the *McDonnell Douglas* burden-shifting process and should instead reach the ultimate issue of discrimination.").

But the Eleventh Circuit still honors the *McDonnell Douglas*

framework, at least in most cases, *see, e.g., Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) ("In evaluating disparate treatment claims supported by circumstantial evidence, we use the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*."), and so the court briefly notes that the first two steps in the framework are met in the instant case.  To make her prima facie case, plaintiff must show "(1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted."  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (citation omitted).  She is a member of three protected classes: she is black, female, and part of the separate subclass, black female, created by the combination of the two. She applied for and was qualified for a promotion; she completed all of the tests required to enter the promotion pool.  She was rejected despite her qualifications.  Finally, an equally or less-qualified employee who is a white male was promoted. Defendant argues that the second element is not met because, since plaintiff never submitted a letter of interest for the position, she never "applied" for it.  But given the parties' dispute over this issue, defendant's claim that it received the letter too late is better interpreted as a proffered legitimate

21

hiring reason, and analyzed for pretext.

The second step of the *McDonnell Douglas* framework is even more easily satisfied.  Defendant has provided two legitimate, nondiscriminatory reasons for choosing Tillman over plaintiff for the January 2011 promotion: that it never received a letter of interest from plaintiff, as mentioned above, and that even if it had, Tillman would have been selected because Stan Garrett, the person responsible for the hiring decision, has a strong preference for promoting employees from different centers to avoid problems with morale and exercise of authority.

What remains is the question of whether these explanations are credible or mere pretext for a discriminatory hiring decision.  The guiding rule for this question is that "[a] reason is not pretextual unless it is shown **both** that the reason was false, **and** that discrimination or retaliation was the real reason."  *Morrison v. City of Bainbridge, GA*, 432 F. App'x 877, 881 (11th Cir. 2011) (emphasis added).  As plaintiff points out, however, stating this rule in two separate steps is controversial, and other precedents seem to contradict that approach directly.  In *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964-65 (11th Cir. 1997), for example, the court reversed a district court applying the two-step approach, holding that, "[u]nder the established rule of law in this Circuit, a plaintiff can survive a motion for summary judgment or for

22

judgment as a matter of law simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) ("[O]nce the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action.  At that point, judgment as a matter of law is unavailable.").  Nor is the Eleventh Circuit alone in its vacillations; even the Supreme Court has had similar difficulty making up its mind.  *Compare St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514-15 (1993) (5-4 decision) ("[N]othing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.") *with id.* at 531 n.7 (Souter, J., dissenting) ("The majority's chosen method of proving 'pretext for discrimination' changes *Burdine's* 'either ... or' into a 'both ... and.'") (citing *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248 (1981)).[7]

This court concludes that, although *Evans* has never been revisited by later cases (at least, it has avoided the stern gaze of Shepard's), the Eleventh Circuit now prefers the two-step analysis of *Morrison*.  In the Supreme Court's most recent foray into the pretext question, it reconciled *Hicks* and *Burdine* by explaining that, while "it is **permissible** for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (emphasis in original), "[t]his is not to say that such a showing by the plaintiff will **always** be adequate to sustain a jury's finding of liability," *id.* at 148 (emphasis in original).  Thus, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . [including, among other things,] any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-49.  The Eleventh Circuit cases decided since *Reeves* have used a modified two-step analysis to apply the *Reeves* holding.  First, "an employee must meet [each of the

---

[7]Title VII is among the most frequently litigated statutes in federal courts across the circuit and country, and the federal reporters are stuffed to the brim with Title VII cases. Unfortunately, this creates at least for this court more confusion than clarity, as there is virtually no rule that can be stated for a which a contradictory case cannot be found.

employer's proffered reasons] head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Second, the employee must, in accordance with the same standard applied in any other kind of case, raise a sufficient question of fact as to the ultimate issue of discrimination to avoid summary judgment. *Id.* at 1025 n.11 (discussing *Reeves*).  The second step can be, but is not always, satisfied without additional evidence by the flimsiness of the employer's proffered reasons and the strength of the employee's prima facie case.  *See Reeves* at 143-49.

On, then, to this two-step approach.  The first step is whether defendant's proffered reasons are false.  Defendant's second proffered reason--that even if Garrett had considered plaintiff, he would not have chosen her because he prefers to promote from outside the center--fails on its face.  The question in Title VII cases is what actually motivated an employer, not what hypothetically could have, should have, might have, etc. Certainly a party in American litigation may rely, despite the apparent paradox, on contradictory alternative legal arguments (*e.g.*, "I didn't shoot him, and he had it coming!").  But that is different from a witness in a case offering recollections "in the alternative" when testifying as to his mental thought process.

Defendant's first proffered reason--that plaintiff never submitted a letter of interest--is more significant.  Plaintiff's repeated insistence that she sent a letter to defendant on time

is so flimsy as to evaporate.  She relies heavily on the testimony of her supervisor, Wendy Whitlow, that she did submit a letter of interest and that if UPS did not receive the letter, it was due to some error on the company's part.  But Whitlow's testimony unambiguously concerns the letter of interest that qualified plaintiff for **2010** promotion opportunities.  *See* Whitlow Dep. at 56-58 (explaining that she had to re-do her 2010 performance evaluation for plaintiff because the first one "didn't get where it needed to be"); Letter from Wendy Whitlow to UPS (July 27, 2011), Pl.'s Ex. 7 ("In **2010** Charlette Swann did submit her letter of intent for promotion to me.  I submitted her letter of intent along with the promotion packet . . ." (emphasis added).  The evidence is also clear that plaintiff's letter concerning **2011** opportunities was submitted on January 17, 2011. *See* Pl.'s Ex. 5 (letter of interest cover sheet and letter of interest both dated 1/17/11).

Plaintiff also argues that, regardless of whether or when her letter was received, its lateness was not the real reason for defendant's hiring decision because, "at the latest [January 17], [UPS] had a completed packet for Plaintiff two weeks before offering the position to Tillman."  Pl.'s Opp'n at 28. Furthermore, according to plaintiff, Tillman testified that he never had an interview for the position, despite defendant's "interview log" to the contrary, *id.* at 17, and UPS's "actions

appear to [have] rush[ed] the Tillman promotion through," *id.* at 24.  As before, however, the evidence provides no reasonable support for these claims.  While Tillman was not officially promoted until January 31, 2011, *see* Tillman Dep., Pl.'s Ex. 65, at 13-14, the hiring process for that promotion logically got rolling significantly earlier.  Lonzell Wilson, the Area Human Resources Manager responsible for collecting the promotion pool, testified that he submitted names for Garrett's consideration sometime during the second week of January.  Wilson Decl., Def.'s Ex. 11, ¶ 8.  All consideration was apparently complete by January 13, when Garrett submitted a "requisition form" to UPS for the new position.  Management/Specialist Requisition Form, Def.'s Ex. 9A.  Indeed, Wilson testified that plaintiff was just one of seven candidates, including black and white men and women, who submitted letters for the position in January but too late for the demanding deadline.  Wilson Decl. ¶ 10.  None were added to the promotion pool.  *Id.*  Finally, while Tillman testified that he never had what he considered a "formal interview," he did classify what was shown on the "interview log" as "just talking to [the hiring managers]."  Tillman Dep. at 15.

Plaintiff's final argument regarding the letter of interest is that "managers for UPS . . . testified it was common knowledge that Plaintiff was seeking a management position," Pl.'s Opp'n at 23, and thus defendant had "notice of Plaintiff's letter of

intent," even if not the actual letter, in time to consider her.
*Id.* at 24.  This argument fails in light of defendant's well-
established policy requiring employees to follow rigid procedures
to apply for promotions, regardless of whether the procedures
serve any practical purpose.  It may be true that defendant's
policy is draconian and anal.  It may also be true that requiring
a new letter for each calendar year and then collecting
candidates just a week into that year makes the position
needlessly difficult to apply for.  It may be that the policy
cuts out excellent candidates, or even the best candidates.  It
may be that the policy is absurd, stupid, or even sadistic.  But
none of this, absent evidence of discrimination, would make the
policy actionable under Title VII.  *See Alvarez v. Royal Atl.
Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("Title
VII does not require the employer's needs and expectations to be
objectively reasonable; it simply prohibits the employer from
discriminating on the basis of membership in a protected
class."); *see id.* (collecting cases on "'embarrassing' but
non-actionable [hiring] reasons under Title VII").

     If this court correctly understands *Hicks*, *Reeves*, *Chapman*,
and the other cases described above, the foregoing discussion is
dispositive.  Plaintiff cannot proceed to trial if she cannot
meet defendant's proffered nondiscriminatory hiring explanations
"head on."  However, in case the "either/or" language of *Burdine*

survives, and in case circumstantial evidence of discrimination can in itself serve to rebut an otherwise stalwart nondiscriminatory hiring explanation, the court will briefly peek ahead to the second question of the pretext analysis: did discrimination more likely than not motivate defendant's hiring decision?  The crux of plaintiff's argument here is that defendant has been the subject of so many discrimination complaints that yet another hiring of a white man cannot be just coincidence.  Pl.'s Opp'n at 33-37.  Furthermore, says plaintiff, by refusing to remove managers, like Mowery and Diaz, who had numerous complaints against them, defendant created a "discriminatory and retaliatory atmosphere."  *Id.* at 35. According to plaintiff, this evidence, viewed in its totality, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id.* at 37 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted)).

   While plaintiff correctly notes that this kind of "me too" evidence can be relevant to the issue of defendant's intent or motive, and thus can be admissible at trial under Federal Rule of Evidence 404(b), *see Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286-87 (11th Cir. 2008), it is not automatically so. *See Davis v. Dunn Const. Co., Inc.*, 872 F. Supp. 2d 1291, 1318 (N.D. Ala. 2012).  If the "me too" evidence is too far removed

from the case at hand, it may be excluded as overly prejudicial under Federal Rule of Evidence 403. *Davis*, 872 F. Supp. 2d at 1318. In this case, many of the "me too" complaints involved Diaz, who had no role in the January 2011 promotion and who was promptly transferred away from plaintiff's Birmingham facility, and many involved EEOC charges which were not pursued and for which no findings of fact were ever made. This evidence has minimal probative value, and is thus not likely to be admitted at trial. *See id.*

Furthermore, even if admissible, the full "mosaic" of circumstantial evidence in this case includes substantial evidence that cuts the other way. Both Garrett, the manager responsible for the hiring decision, and Wilson, the manager responsible for handling plaintiff's letter of interest and selecting the promotion pool, are black and began at UPS as hourly employees before being promoted to manager. So too is Walter Graham, the person selected by Garrett for the August 2011 position. While plaintiff also alleges discrimination based on her sex, every "me too" complaint since 2010 that she cites, excluding her own, is based on race. Pl.'s Opp'n at 33-34. Even as to sex, at least one of the hiring managers (Campbell) and at least one of the promotion choices (Whitlow) that plaintiff complains of are women. And most of the events described took place under the supervision of an Operations Manager (Thomas),

the highest rank involved here, who was both black and female.

Of course, resolution of legitimate factual disputes is the prerogative of the jury, and so if the only question presented by this conflicting evidence were whether discrimination exists at UPS, it would be resolved for purposes of this motion in plaintiff's favor.  But even with the evidence read in plaintiff's favor, "[d]iscrimination in the air, so to speak, will not do."  *Chuang v. T.W. Wang Inc.*, 647 F. Supp. 2d 221, 230 (E.D.N.Y. 2009).  It is discrimination **in an employment action adverse to plaintiff** that must be shown.  Plaintiff's "me too" evidence is about the company generally; defendant's "but not me" evidence involves individuals directly involved in the January 2011 promotion.  In light of defendant's un-rebutted legitimate hiring explanation and in light of the evidence of managers of plaintiff's same protected class that were involved in **her specific hiring decision**, plaintiff's generalized "me too" evidence is insufficient to proceed to trial on.

## C.  RETALIATION

The final issue in this case is whether plaintiff has presented sufficient evidence to defeat defendant's summary judgment motion with respect to her claims of retaliation.  In contrast to its ruling on discrimination, the EEOC did find cause to believe that retaliation occurred.  But as before, this court's review of the EEOC determination is *de novo*.  *See Young*

31

*v. FedEx Exp.*, 432 F. App'x 915, 917 (11th Cir. 2011).

Retaliation claims under Title VII are subject to the same three-part *McDonnell Douglas* framework as are discrimination claims. *See Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494-95 (11th Cir. 1989). In order to establish a prima facie case under the first step of the framework, plaintiff must show that "(1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citations omitted).

The first two of these requirements are easily met in the present case. Plaintiff engaged in statutorily protected expression by filing an EEOC complaint based on her altercation with Diaz. *See Tarmas v. Sec'y of Navy*, 433 F. App'x 754, 762 (11th Cir. 2011) ("There is no dispute that the filing of a claim with the EEOC is a 'statutorily protected activity.'") (citation omitted). She suffered an adverse employment action when she was passed over for the promotion.

The causal connection requirement is considerably more problematic. Because the requirement is merely part of plaintiff's initial prima facie case, it is not onerous. *See EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993) ("This court has interpreted the causal link

requirement broadly; a plaintiff merely has to prove that the
protected activity and the negative employment action are not
completely unrelated."); *Clover v. Total Sys. Servs., Inc.*, 176
F.3d 1346, 1354 (11th Cir. 1999) ("[A] plaintiff need only show
'that the protected activity and the adverse action were not
wholly unrelated.'") (citation omitted).  Still, "[a]t a minimum,
a plaintiff must generally establish that the employer was
actually aware of the protected expression at the time it took
adverse employment action."  *Id.* (quoting *Goldsmith v. City of
Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)).  As the Eleventh
Circuit has explained, "[t]hat requirement rests upon common
sense."  *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799
(11th Cir. 2000).  "A decision maker cannot have been motivated
to retaliate by something unknown to him."  *Id.*

In this case, plaintiff has failed to meet her minimal
burden of showing that defendant was aware of her EEOC complaint
at the time it made its hiring decision.  The evidence shows that
Stan Garrett was the manager responsible for the hiring decision,
and Garrett has specifically testified that he had no knowledge
of plaintiff's EEOC complaint at the time he chose Tillman for
the position.  Garrett Dep. at 81.  While it is true that Garrett
also testified that he was aware of Diaz's arrest, that awareness
did not include any knowledge that plaintiff was involved in the
arrest in any way.  *Id.* at 44-48.

33

Plaintiff attacks Garrett's testimony on the grounds that other managers with awareness of the EEOC complaint were likely involved in the hiring decision, and furthermore that, to her, it is "unbelievable that managers at UPS would not be aware of a pending EEOC charge by a current employee."  Pl.'s Opp'n at 28-29.  The defendant does itself no favors by attempting to sweep away this issue with an assertion that "the law is clear that . . . 'neither a court nor a jury may impute knowledge to a decision-maker who has sworn [she] had no actual knowledge.'"  Def.'s Reply at 19 (quoting *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002)) (alteration in Def.'s Reply).  Believe it or not, this court actually reads (with mixed utility) the cases cited by the parties before it, and it does not require a Robert Langdon research adventure to find that the sentence defendant quotes from *Brochu* as "clear law" is in fact a summary of one of the party's arguments in that case: "**the City argues that** neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge."  304 F.3d at 1156 (emphasis added on words absent from defendant's brief).  Regardless, the line of cases relied on by that party in that case is about whether "constructive knowledge" can be used to establish a prima facie retaliation case--that is, whether the established knowledge of others within a company can be imputed to a decision-maker whom the litigants agree had no actual

34

knowledge of the protected activity. *See, e.g., Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001). That issue is not presented here, where plaintiff argues more simply that Garrett's testimony is not credible and that, in fact, he did have direct knowledge of plaintiff's EEOC complaint but bravely committed perjury to protect his company.

The court concludes for other reasons that plaintiff's argument must fail. While evaluating the credibility of witness testimony is normally the exclusive privilege and responsibility of the jury, it is significant that *McDonnell Douglas* and its progeny place the burden of establishing a prima facie case squarely on the plaintiff. *See* 411 U.S. at 802. Because it will be plaintiff's burden at trial to present a prima facie case, it is plaintiff's burden at summary judgment to produce evidence of it. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In light of this burden, a simple "nuh uh" response to defendant's claims is insufficient. Instead, plaintiff must present at least some affirmative evidence on which a jury could base a conclusion that Garrett was lying under oath. *See, e.g., Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 800 (11th Cir. 2000) (summary judgment for defendant because it was improper to "allow a factfinder to decide, without any basis other than temporal proximity, that the decision maker is lying"); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1355

35

(11th Cir. 1999) (judgment as a matter of law for defendant because "[a] jury finding that [defendant] was aware of [plaintiff's] protected conduct must be supported by reasonable inferences from the evidence, not mere speculation"); *cf.* *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) ("sufficient circumstantial evidence" where plaintiff produced affirmative evidence that: (1) after plaintiff "informed [another employee] of her intention to look into the possibility of filing an EEOC complaint, [that employee] urged her not to do so and told [plaintiff] he would go talk to [defendant] about the . . . position"; (2) "[t]he next morning, [the employee] did in fact visit [defendant] in his office"; and (3) "immediately after [the employee] departed, [defendant] called [plaintiff] into his office to inform her that the . . . position had been filled and there was nothing she could do about it.").

    Plaintiff has no such evidence in this case.  First, she has no evidence that anyone other than Garrett was involved in the hiring decision.  It is true that the evidence surrounding the 2009 promotion of Wendy Whitlow shows that District Manager Dale Mowery was joined by Human Resources Manager Jeff Poulter and Operations Manager Charlene Thomas in making the hiring decision, and it does not take much imagination to suspect that a similar team contributed to the 2011 promotions.  But Poulter left UPS's Birmingham District in April, 2010, Poulter Decl. ¶ 3, and Thomas

36

moved to Texas in March, 2010, Thomas Dep. at 8-9.  While the court will draw inferences in favor of plaintiff from the evidence presented, presuming the existence of hypothetical replacement managers with hypothetical job duties goes too far. Second, plaintiff's claim that it is improbable that managers at UPS would be unaware of pending EEOC charges is simply too speculative.  Given that UPS is a large company, with countless managers and countless levels of seniority (and with countless EEOC charges floating about to keep track of), an automatic presumption of manager knowledge, unsupported by more specific evidence, is not permitted.

Because the fact that plaintiff has not shown that defendant was aware of her EEOC complaint defeats plaintiff's retaliation claim, the court need not reach the issue of whether the hiring decision had sufficient temporal proximity to the EEOC complaint to show causation, nor need it revisit the second and third stages of the *McDonnell Douglas* test.

**CONCLUSION**

Plaintiff has presented substantial evidence of her qualifications, and the evidence is persuasive.  But it is not the role of the court to "sit as a 'super-personnel department,'" *Alvarez v. Royal Atl. Developers*, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010), and so if the court expresses approval of plaintiff's candidacy for promotion, it can do so only in dicta.  Title VII

protects only against employment decisions that discriminate against a protected class or retaliate against protected behavior, and absent evidence of that, plaintiff cannot prevail. For that reason and for the reasons expressed in this opinion, defendant's motion for summary judgment will be granted, and the case will be dismissed in its entirety on the merits.  The court will contemporaneously issue an Order consistent with this Memorandum Opinion.

DONE this 4th day of October, 2013.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE